No. 53,465

STATE OF KANSAS, *Appellee,* v. HARRY L. TAYLOR, *Appellant.*

(642 P.2d 989)

Opinion filed April 3, 1982.

*Joseph D. Johnson,* of Topeka, argued the cause and was on the brief for the appellant.

*Frank Yeoman, Jr.,* assistant district attorney, argued the cause and *Gene M. Olander,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Harry L. Taylor was convicted by a jury of second-degree murder (K.S.A. 21-3402) on March 4, 1981. This is an appeal from that conviction.

This prosecution arose from the following events. Efelton Sanders was the owner and operator of a grocery and gambling establishment in Topeka called the Party Shack. Melvin Walker, Jr., who Sanders considered a stepson, worked there on occasion. Sanders kept a .38 pistol at the Party Shack. Walker also had access to the gun. On July 12, 1980, prior to leaving on a trip to Kansas City with his friend, Harry L. Taylor, Walker discovered

the gun had disappeared. Walker accused Taylor of taking the gun.

Walker's accusations against Taylor continued off and on until November 21, 1980. On that day Taylor and a friend were helping Taylor's sister move to a new apartment. In the course of this endeavor, Taylor stopped at the Party Shack for pop and cigarettes. Walker was the store clerk. He refused to wait on Taylor. Taylor asked Walker outside for a private discussion. Taylor proceeded outside armed with a gun he possessed for his "protection." Walker followed and as he pushed the screen door open Taylor shot and killed him. Taylor said he thought Walker also had a gun and he was merely "beating Melvin to the draw." Thereafter, Harry L. Taylor was arrested and charged with first-degree murder. The jury conviction followed.

Appellant claims the trial court erred in refusing to suppress statements made to the police prior to *Miranda* warnings being given. When Harry Taylor was stopped for questioning the officer asked him for his name. Appellant answered, giving a fictitious name. The officer knew it was Harry Taylor and proceeded to frisk him. The appellant was then taken to the police station and again asked his name. He replied "Harry Taylor, why should I lie anymore." At this time, appellant was advised of his constitutional rights, which he voluntarily waived.

Appellant argues the statements he made before the *Miranda* warning are inadmissible. In *Miranda v. Arizona,* 384 U.S. 436, 444, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), the U.S. Supreme Court held "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

The admissibility of appellant's statements depends upon whether they were the result of a "custodial interrogation" or an "investigatory interrogation." A custodial interrogation, which requires that *Miranda* warnings be given, involves "significant restraints on [a subject's] freedom of movement which are imposed by some law enforcement agency." *State v. Greenberg,* 4 Kan. App. 2d 403, 405, 607 P.2d 530, *rev. denied* 228 Kan. 807 (1980); *State v. Brunner,* 211 Kan. 596, Syl. ¶ 2, 507 P.2d 233 (1973). In *State v. Bohanan,* 220 Kan. 121, 128, 551 P.2d 828

(1976), it was recognized, "that general on-the-scene questioning as to facts surrounding a crime or *other general questioning of citizens in the fact finding process* does not constitute custodial interrogation requiring a *Miranda* warning." An investigatory interrogation, requiring no warning, is defined as "the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way." 220 Kan. at 128.

Clearly, Taylor's initial untruthful identification of himself is admissible as the product of an investigatory interrogation. Moreover, K.S.A. 22-2402 allows an officer to "stop any person in a public place whom he reasonably suspects is committing, has committed, or is about to commit a crime and may demand of him his name, address and an explanation of his actions." Taylor's objections to the court admitting his first statement to the police are without merit.

However, the statements made at the police station before defendant was advised of his rights are more troublesome. Obviously, Taylor was in custody at the station. There is no reason the officers should not have advised him of his *Miranda* rights as soon as he arrived there. Unless the initial question at the police station about appellant's identity is not considered "interrogation," the court erred in admitting it. In *Miranda* the court stated that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 444. More recently, in *Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L.Ed.2d 297, 100 S.Ct. 1682 (1980), the court held:

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."

The question asked of appellant at the police station was a form of express questioning but it was merely a request for appellant to identify himself. This could easily gravitate in favor of an accused by preventing interrogation of the wrong person. We hold a request for a person to identify himself is not interrogation within the meaning of *Miranda* and *Innis*. The trial court did not err in admitting Taylor's answer. The first issue is without merit.

Appellant next argues the trial court erred in admitting a gun sold by Taylor to a police operative during a "sting" operation because the chain of custody was not established. The police had set up a fencing business run by an operative, Mr. Dobbins, in the garage of a Topeka residence. Mr. Dobbins was not a police officer. On July 15, 1980, Harry Taylor sold a gun to the fence. A police detective was present and secretly watched the entire transaction. As soon as the gun changed hands and Taylor was gone the detective seized the gun. Later, Mr. Sanders identified the gun as the one missing from his business. The State failed to present Mr. Dobbins at trial. Appellant claims Mr. Dobbins is the missing link in the chain of custody and because the chain was broken the gun should not be admitted.

Establishing the chain of custody is part of the foundation for the admission of physical evidence. "Generally, the admissibility of physical evidence is within the sound discretion of the trial court and is to be determined by the court on the basis of its relevance and connection with the accused and the crime charged." *State v. Beard*, 220 Kan. 580, 584, 552 P.2d 900 (1976). Deficiencies in the chain of custody ordinarily affect the weight of the evidence, not its admissibility. *State v. Crawford*, 223 Kan. 127, 128, 573 P.2d 982 (1977), *cert. denied* 435 U.S. 930 (1978).

However, there is no break in the chain of custody because the detective observed the entire transaction and immediately seized the pistol. Admission of the evidence was therefore proper.

Appellant's final contention is the court erred when it allowed the State to present evidence in rebuttal of Taylor's participation in the "sting" operation. During pretrial proceedings the trial court and defense counsel discussed the possibility of an order in limine:

"MR. JOHNSON: (Interrupting) Your, Honor, I do want to take up a motion for an Order in Limine at this point, or do you want to —
THE COURT: (Interrupting) What orders?
MR. JOHNSON: As I explained to the Court earlier, I filed a motion because

we're aware of the fact that there is another case presently pending against our client wherein —

THE COURT: (Interrupting) There will be no mention made of any other case.

MR. JOHNSON: Very well.

THE COURT: Against this man. We're trying him for this crime, and I don't want other cases brought in.

MR. JOHNSON: Yes.

MR. YEOMAN: Yes.

THE COURT: Okay. There is going to be no mention made of his other cases."

On direct examination the appellant testified about Walker's accusations concerning the "stuff" appellant had allegedly taken from him. Specifically, Taylor testified Walker came to his house and stated "[t]hat he wanted his gun." Taylor answered he "didn't know what he was talking about . . . ." Later during direct examination Taylor identified the gun obtained in the fencing operation as one he had purchased at a local pawn shop and introduced a receipt to that effect. During cross-examination the court allowed the prosecution to inquire of the appellant whether he actually stole the gun from Melvin Walker. Finally, during rebuttal the police detective who observed Taylor sell the gun to the fence was allowed to testify.

In *State v. Weigel*, 228 Kan. 194, 612 P.2d 636 (1980), we stated:

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice." Syl. ¶ 9.

The rebuttal evidence was proper. The appellant offered evidence to show he did not steal Melvin Walker's gun. The State's rebuttal tended to counter that evidence. Further, the trial judge gave a proper limiting instruction. See also *State v. Washington*, 229 Kan. 47, 60, 622 P.2d 986 (1981).

The judgment of the trial court is affirmed.